LEVI L. WHITNEY *vs.* WHEELER COTTON MILLS.

JOHN RHODES *vs.* SAME.

MOWRY LAPHAM *vs.* SAME.

Worcester.    October 3; 1889. — May 9, 1890.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Deed — Watercourse — Rights of Riparian Owners — Non-user — Prescription.*

The grantee of a mill site and privilege on a stream, whose deed contains no special mention of water rights, acquires a right to the whole natural flow thereof, subject to the rights of the upper riparian owners.

The owner of a stream at the outlet of a great pond, while he may dig out the channel, and maintain a reservoir, dam, and gate, and accumulate the water for the benefit of his own mill, and is not obliged to hold back the water or regulate the natural flow of the stream for the benefit of lower riparian owners, cannot unreasonably interfere with the natural flow of the stream, to their injury; and if he conveys a lower privilege, the grantee acquires no right to the use of the reservoir unless stipulated in the deed, though necessary for the beneficial use of the grantee's mill.

The owner of mill sites and privileges upon the outlet of a great pond retained the upper privilege, with a dam, flume, and gate, and in 1825 conveyed a mill site below by a deed reciting that, for the purpose of operating his mill, the grantee might raise the gate "so as to let as much water run as shall be equivalent to carrying two engines in the grantor's paper-mill when the grantor does not suffer so much to pass at his paper-mill"; but if the grantor should do so, "the grantees, their heirs and assigns, are not to meddle with said gate, or draw any more water, nor are they to draw said quantity at any time except from six of the clock in the forenoon to six in the afternoon of each working day." In 1828 the grantor conveyed another privilege below by a deed providing that, if the grantor neglected to draw water from the pond "sufficient to carry two engines as now running in the grantor's mill from five A. M. to seven o'clock P. M. on each working day," the grantee might "draw so much water at any time so neglected by the grantor, and no more." Both deeds provided that the grantees should bear a just proportion of the expense of maintaining the dam, flume, and gate at the outlet of the pond. In 1829 he conveyed another lower privilege by a deed containing no special mention of water rights. *Held,* that the right of the grantees

under their deeds was the ordinary right of riparian owners, limited only by the stipulation as to the quantity of water that should be sent down to the first two grantees ; that the grantor was not required to maintain the dam and gate, or to regulate or hold back the water, for the grantees' benefit; that his intention in specifying two engines was not to include all the machinery in his mill, as then used by him, as the measure of the grantees' rights ; and that, under the conveyances, he could not render nugatory the grantees' right to open the gate and obtain water for their mills by unreasonably letting down the water for his own convenience.

The recitals of an ancient deed are inadmissible in evidence to enlarge the estate granted in a prior deed of the same grantor, to the impairment of an intervening title.

Riparian rights are not lost by non-user and abandonment.

A right by adverse user and prescription to interfere with the natural flow of a stream, beyond the right incident to riparian ownership generally, can be established only upon clear evidence.

THREE BILLS IN EQUITY, to regulate the water rights of certain owners of mill sites and privileges upon Mill Brook, the outlet of Singletary Pond, a great pond in Millbury. The cases were referred to a master, and, by the request of the parties, were reserved by *Devens*, J., for the consideration of the full court, upon the report of the master and the defendant's exceptions thereto. The material facts appear in the opinion.

*F. P. Goulding*, for the defendant.

*W. W. Rice & H. W. King*, (*J. Hopkins & C. M. Rice* with them,) for the plaintiffs.

C. ALLEN, J. The several plaintiffs and the defendant are respectively the owners of mill sites and privileges upon Mill Brook, a stream which flows from Singletary Pond to the Blackstone River. The defendant corporation owns the first or upper privilege. The plaintiffs own, respectively, as follows : the plaintiff Whitney owns the second privilege; the plaintiff Lapham, the third, and the plaintiff Rhodes, the fourth and seventh. The owners of the fifth and sixth privileges are not before us. The plaintiffs complain of the manner in which the defendant regulates and manages the flow of water from Singletary Pond, and allege that at times the defendant wrongfully keeps back the water, and at other times wrongfully sends down too much ; and they pray for an injunction, and also for decrees establishing the respective rights of the parties in Singletary Pond and in Mill Brook ; and also for damages.

The cases come before us upon a master's report and numerous

exceptions taken by the defendant thereto, with such portions of the evidence as the parties deemed important. We shall not be able to do much more than to declare the general rights of the parties, upon the cases as presented, leaving them to make before a single justice such further application for the settlement of the decrees, or otherwise, as may be necessary.

Many things heretofore controverted may now be briefly disposed of as conceded, or as immaterial, in the view we take of the principal questions respecting which the parties are at issue. It may now be assumed that Caleb Burbank was the owner of all the mill sites and privileges in 1825, when he began to make conveyances, together with all the right which anybody had, by means of a dam, gate, etc. at the outlet, to regulate and control the flow of water from the pond. This is not now controverted by either party. The third privilege, now owned by Lapham, had upon it a paper-mill owned and operated by Burbank. There has been some question which of the two outlets of the pond was the original one, but as both outlets come together before passing the first privilege, it is not material to determine which was the original one. It is also now admitted that the foreclosure of the mortgage from Burbank to Waldo, which is the foundation of the defendant's title, was valid.

It will be convenient to consider, in the first place, what rights the parties respectively acquired under their deeds; and afterwards to see if these rights were varied by any adverse user or prescription, on one side or the other.

The first deed in the order of time was a conveyance which included the fourth privilege, now owned by the plaintiff Rhodes. This was a deed from Caleb Burbank to Benedict and Braman, dated January 3, 1825, of a described parcel of land on Mill Brook, with a right to erect mills at such place on the premises as to command a certain defined and limited head and fall of water; " also with the right to the grantees, their heirs and assigns, (when necessary to drive their works,) to hoist the gate at said Crooked Pond [which was another name of Singletary Pond] so as to let as much water run as shall be equivalent to carrying two engines in the grantor's paper-mill, when the grantor does not suffer so much to pass at his paper-mill, but when the grantor, his heirs or assigns, permit that quantity to

pass the paper-mill, the grantees, their heirs and assigns, are not to meddle with said gate, or draw any more water, nor are they to draw said quantity at any time except from six of the clock in the forenoon to six in the afternoon of each working day, and the grantees, their heirs and assigns, are to be at their just proportion of the expense of maintaining the gate, flume, dam, etc. at Crooked Pond, and of making improvements upon the same when necessary for the common benefit."

The second deed in the order of time was a conveyance which included the seventh privilege, which is also now owned by Rhodes. This was a deed from Burbank to Timothy H. Longley, dated May 1, 1825, of a described parcel on Mill Brook, with a certain right of flowing the land above; "I also give and grant to the said Longley, his heirs and assigns, the privilege (when it may be necessary for the purpose of keeping in operation mills which the grantee may have upon the premises) of raising the gate of the grantor, which is situated in the great canal so called, at the outlet of the pond known by the name of Crooked Pond, so as to let so much water run as shall be equivalent to carrying two engines in the grantor's paper-mill by means of a breast-wheel whenever the grantor does not suffer so much to pass to the works which shall be erected upon the premises; but when the grantor, his heirs or assigns, shall permit so much water to pass to the premises aforesaid, the grantee, his heirs or assigns, are not to meddle with said gate, nor draw any more water, nor are they to draw said quantity at any time except from six o'clock in the morning to six o'clock in the evening of each working day, and the grantee, his heirs and assigns, are to be at their joint proportion of the expense of maintaining the gate, flume, dam, etc. at Crooked Pond, and of making improvement upon the same when necessary for the common benefit."

The third deed in the order of time was a conveyance which included the second privilege, now owned by the plaintiff Whitney. This was a deed from Burbank to Hervey Waters, dated September 1, 1828, of three lots, with a certain right of flowing the land above. "Furthermore, if the said Burbank, his heirs or assigns, shall neglect to draw water from Singletary Pond sufficient to carry two engines, as now running in the grantor's

mill from five A. M. to seven o'clock P. M. on each working day, said Waters, his heirs or assigns, shall have a lawful right to draw so much water at any time so neglected by the grantor or his assigns, and no more, and said Waters, his heirs or assigns, shall be at equal expense in erecting, making, or repairing the dam, flume, or gates at Singletary Pond with the other owners of privileges from said pond."

The fourth deed in the order of time was a mortgage, which included the third mill site, now owned by the plaintiff Lapham. This mortgage was given by Burbank to Stephen Salisbury, dated March 23, 1829, and included various other parcels of land besides the mill site, but it contained no specific grant of rights of water in the pond or stream. This mortgage was duly foreclosed.

The titles under the above deeds all came by mesne conveyances to the several plaintiffs.

The title of the defendant is derived from Burbank, through a mortgage given by him to Sarah Waldo, dated April 16, 1829, of various parcels of land, one of which included the first or upper privilege, situated "immediately below the outlet of Crooked Pond, so called, with the mills and privileges thereon and thereto belonging." This mortgage was duly foreclosed, possession for breach of condition having been given in 1843.

In order to determine what was the extent of the rights granted by the first three of the deeds above mentioned, it is, of course, proper to read the deeds in the light of the facts which existed and were known to both parties at the times when the deeds were given; and having done this, the extent of the grant must depend upon the meaning of the words used. Apparently having this rule in mind, the master has made a finding as follows: "I find that Caleb Burbank, when he made these grants of water rights in said deeds of the plaintiffs' and defendant's privileges in 1825, and thereafter as above recited, had adapted his paper-mill, as a water mill, to the capacity of the stream, so regulated in its flow from Singletary Pond as a reservoir as to produce a constant and uniform volume of water during each working day of the year, and, not being then familiar with the use of the term 'horse power' as the measure of motive power in the operation of mills, he adopted the requirements

of his paper-mill as then run, with 'two paper engines' and the machinery then necessarily used therewith in making paper, as the measure of the rights of the grantees, their heirs and assigns, in their respective grants, as aforesaid, from him in the waters of said reservoir and stream therefrom, retaining for the owner of the upper privilege the care and management of the reservoir gate, subject to the rights of the owners below, under these grants, to hoist said gate when necessary to give a regular and uniform flow of said stream, in quantity of volume, so measured by the use and requirements of said paper-mill, — all owners of privileges on said stream to contribute equally in the expense of maintaining said reservoir for their common benefit."

Two questions arise upon this finding: first, whether, assuming the facts to be as thus stated, the language of the deeds can be so stretched as to give to the several grantees a right to enforce such a regulation of the water as to produce a constant and uniform volume of water during each working day of the year; and secondly, whether the evidence warrants a finding that such was the intention of the grantor in giving the deeds. We are unable to agree with the finding of the master in either particular.

The language of the deeds does not permit the construction put upon them by the master. It is of no consequence how Burbank operated his own mill, or managed or regulated the water for his own convenience and benefit; what he conveyed to these grantees was the ordinary right of riparian owners, except that they were only entitled to have a certain specified and limited quantity of water sent down the stream during certain hours of every working day. If that quantity should come, it was expressly stipulated in the first two deeds that the grantees should not meddle with the gate, or draw any more water; while in the third deed, it was specified that, if the grantor should neglect to draw that quantity, the grantee might draw so much, and no more. In any event, their right was expressly limited to that quantity of water, which in each deed was described as being what would be sufficient to carry or equivalent to carrying two engines in the grantor's mill for so many hours a day, the number of hours being greater in the last deed; and thus, in respect to the

quantity of water which they were entitled to have flow in the stream, their right was not quite that of ordinary riparian owners.   There is not in either deed anything giving to the grantee a right to have the water held back for his benefit. The only provision that looks at all like an understanding between the parties that the water should be held back for the benefit of the grantees, is that which subjects the grantees to a part of the expense of maintaining the dam, flume, and gate at the outlet of the pond.   If there were any other words going to indicate such a right on their part, this provision would certainly lend support to that construction.   But this provision of itself alone by no means contains so much. The accumulation of water in Singletary Pond by means of a dam would naturally, and almost necessarily, be of some benefit to the various mill-owners on the stream.   The three deeds all include a recognition that the grantor, in the first instance, was to have the care of the gate.   The matter that was stipulated for was the quantity of water that should be sent down; not the duty of the grantor in holding back water.   It is possible that, if the present methods of using water had been foreseen, the parties might have stipulated for having the water held back, as well as for sending it down; but they did not do so.   Even if it could be made to appear that they intended to do so, we are unable to find in the words which they used anything which imposes that duty upon the grantor.

But, moreover, the evidence is not sufficient, in our opinion, to warrant a finding that the grantor so intended, or that, in the words of the master's report, he " adopted the requirements of his paper-mill as then run, with ' two paper engines ' and the machinery then necessarily used therewith in making paper, as the measure of the rights of the grantees," both as to letting down and holding back water.   The paper engines, which, as we understand it, were machines for beating up pulp, were operated by water coming through a separate aperture, and to a separate wheel, which did not carry other machinery.   We cannot accept the conclusion that, when the grantor specified two paper engines, he meant to include all the other machinery in his paper-mill.   Nor are we able to find any sufficient

evidence that he intended to be bound for all time to regulate the water for the benefit of the grantees as he was then regulating it for his own benefit. If such had been the intention, it would most likely have been expressly stated. The grantees might well expect, in the natural course of things, to get a benefit from the maintenance of the dam and gate; not necessarily by having the water held back and delivered with reference to their special convenience, but because the water would be so accumulated that a less proportion would run to waste. In the absence of any stipulation or acquired right to the contrary, the owner of an upper privilege may make a reasonable use of the water, and obstruct and accumulate it in a reasonable way for the benefit of his own mill, whatever may be the effect upon the owner below. *Springfield* v. *Harris*, 4 Allen, 494. *Merrifield* v. *Worcester*, 110 Mass. 216, 219. But he must not withhold or let down the water in an unreasonable manner. *Clapp* v. *Herrick*, 129 Mass. 292. And the grantee of a lower privilege 'gets no right to the use of a reservoir owned by the grantor, unless it is so specified in the deed, even although necessary for the beneficial use of his mill. *Brace* v. *Yale*, 4 Allen, 393. The grantor had a going mill, with certain machinery. As a measure of power granted, he selected a certain portion of that machinery, and agreed that, if at any time he should not be sending down enough water to carry that specified portion of his machinery, the grantees might come up and raise his gate and draw that quantity of water; and he bound them to bear a proportion of the expense of maintaining the gate, flume, and dam, not of managing them. There is no occasion for inferring that the grantor intended to grant any greater right in respect to the use of the water than what is according to the plain and natural meaning of the words used.

But since a riparian proprietor has a right to insist that the water shall not be unreasonably withheld or let down by an owner above, an owner of a stream at the outlet of a great pond, who by digging out the channel and erecting a dam at the edge of the pond can hold back all the water, or quickly draw it down nearly to low-water mark, has no right by virtue of his position unreasonably to interfere with the natural

flow of the stream, so as to give the riparian proprietors below a great deal more than the usual quantity of water during a part of the year, and little or none during the remainder of the year. While he is not obliged to hold back the water for the benefit of the owners below, he cannot lawfully let it down in such a way as to leave none for a long time afterwards to maintain the stream in its usual condition.

Three of the deeds above mentioned recognize the existence of a dam, flume, and gate at the outlet of the pond, by which the discharge of water is to be regulated, and they give to the grantees a right to raise the gate and let down the stipulated quantity of water whenever the grantor does not suffer so much to pass at that point. While we hold that these provisions do not require the grantor to maintain the dam and gate, and regulate the flow of water, for the grantees and their successors, nor limit his right reasonably to use the water, even though the quantity used may exceed that required by them, and may leave in the pond too little to supply the amount mentioned in the deeds, it is at the same time manifest that he cannot under these contracts unreasonably let down the water for his own convenience, and thereby render nugatory the right of his grantees to open the gate and obtain water for their mills. If he assumes for his own purposes to regulate the discharge of water from the pond, he must do it with a reasonable regard to the rights of the owners below, having reference to the size and nature of the stream, and the uses to which it is adapted. *Clapp* v. *Herrick*, 129 Mass. 292.

The plaintiffs introduced in evidence a deed from Caleb Burbank to Goddard and Mills, dated September 12, 1833, of the upper privilege, granting " also a right to draw water from Singletary Pond, so called, sufficient to carry two engines in the paper-mill as now used, or all water that naturally runs in said stream, together with all privileges."

The plaintiffs contend that, although the title conveyed by this deed has been cut off by the foreclosure of the Waldo mortgage, yet this deed may be referred to in aid of the construction to be given to the deeds under which they claim title, and that it shows that the grantor considered the quantity of water which was sufficient to carry the two engines as equiva-

lent to all the water that naturally ran in the stream.  For some purposes, no doubt, the recitals in ancient deeds are competent evidence, as, for example, to show the position of a natural boundary; *Drury* v. *Midland Railroad*, 127 Mass. 571, 581; or to show pedigree.  1 Greenl. Ev. § 104.  This doctrine, however, does not extend so far as to allow the estate granted in a prior deed to be expanded by recitals or statements of the grantor in a later deed, to the injury of an intervening title. After making the mortgage to Waldo in 1829, the grantor could not impair the rights thereby conveyed by statements in a subsequent deed, or otherwise, to the effect that by grants made prior thereto he had intended to convey more than those grants of themselves would include.  Moreover, it is at least open to question whether the true meaning of the words in the deed to Goddard and Mills is not that Burbank thereby grants the right to draw water sufficient to carry the two engines in any event, or all the water that naturally runs in the stream, in case such natural flow should be greater than would be sufficient for that purpose.

We are therefore of the opinion that the water rights granted by the first three deeds in the order of time were the ordinary rights of riparian owners, except that the right of each grantee to draw water was limited to a certain quantity during the specified hours of each working day, and that the grantor had no right to hold back the water so that less than that limited quantity would flow down, and if he did so, the grantees might themselves raise the gate at the outlet of the pond and let down water in that quantity; but that the grantees acquired thereby no right to have the water in the pond held back for their benefit.

The plaintiff Lapham, the owner of the third privilege, derives his title under a mortgage which made no special mention of water rights, and therefore the grantee took, as riparian proprietor, a right to the whole natural flow of the stream, subject to such reasonable use of the water by upper owners as the common law allows.  *Tourtellot* v. *Phelps*, 4 Gray, 370. This right, as has already been stated, does not include the right to have the water held back for his benefit by means of the reservoir and dam above, which the owner of the upper

privilege may have a right of using reasonably and properly for his own benefit; but it does include the right to a larger quantity of water than the owners of the other privileges had, provided the natural flow of the stream would furnish it.

The master finds that the plaintiffs have lost by non-user and abandonment the right to have the water come down in excess of ten hours for each working day. The defendant, however, concedes in its brief that there is no evidence to support this finding; and we discover none. Moreover, the rights of riparian owners are not lost in this way. *Johnson* v. *Jordan*, 2 Met. 234, 239. Lapham was merely a riparian owner, and the other plaintiffs had the rights of riparian owners, subject to the qualification contained in their respective deeds.

The defendant, as the owner of the upper privilege, and of the dam, flume, and gate at the outlet of the pond, acquired by the conveyance the right to control the gate and manage and regulate the flow of the water, except that it must not thereby interfere with the rights of owners below. To Lapham, the defendant was bound to send down the whole natural flow of the stream, subject to such reasonable obstructions and accumulations and prior uses as might properly be made for the defendant's own benefit. To the other plaintiffs, the defendant was bound to send down the quantity of water called for by their several deeds, without reference to the convenience of operating its own mill; though this duty would probably be suspended in case a temporary stoppage should become necessary for repairs, or other emergency, outside of the usual course of the operation of the mill. *Pitts* v. *Lancaster Mills*, 13 Met. 156. *Gould* v. *Boston Duck Co.* 13 Gray, 442. *Drake* v. *Hamilton Woolen Co.* 99 Mass. 574, 580. *Hankey* v. *Clark*, 110 Mass. 262.

Having reached these conclusions as to the rights of the respective parties under their deeds, it is further to be considered if these rights have been varied by any adverse user or prescription, on one side or the other.

The master having found that the grantees in the first three deeds in the order of time, by the true construction of their grants, were entitled to have the flow of water regulated for their benefit, did not find that they had gained any right by prescription, nor is it contended in the argument that either of

the plaintiffs has gained in this manner any greater right than his deed conveyed. Nor do we see any evidence to warrant such a claim.

But the defendant earnestly contends that it has gained a right by prescription to manage the flow of water from the pond, for its own benefit, in the manner in which it has of late years been accustomed to do; that is, by retarding the natural flow at times, and at other times letting down more than the natural flow, as suited its own advantage. The master has found to the contrary; and an examination of the evidence fails to satisfy us that this claim of right on the part of the defendant is made out. The importance of clear evidence to sustain a claim of this description was remarked upon by Judge Story, in *Tyler* v. *Wilkinson*, 4 Mason, 397, 404. It appears to us that the acts of the defendant in this direction have been gradual, and that the right now contended for has never been openly asserted till it was done by Redding, the defendant's superintendent, within a few years. The defendant has not suggested any particular time or manner in which it or its predecessors in title acquired, by purchase, grant, or release, any additional right to that conveyed by the mortgage to Waldo. In 1836, when the depositions *in perpetuam* were taken, there was no intimation of such a claim. In 1861 and 1864, when the owners of lower privileges assert that they contributed money towards the expense of repairs, as they were bound to do under their deeds, we find no intimation of any claim by the owner of the upper privilege that their rights under their deeds had been impaired. In short, looking at the testimony which is reported, all of which has been examined with reference to this point, though it is not necessary to refer to it here in detail, we are satisfied with the finding of the master that the defendant has not acquired the right by prescription to control the reservoir and the flow of the stream therefrom; and therefore the rights of the defendant must depend upon the deeds.

It appears by the evidence that Redding, the defendant's superintendent, while acting within the scope of his authority, has practically denied the plaintiffs' rights, and exercised in behalf of the defendant in recent years a larger authority than it rightfully possesses to control the flow of the water. The

defendant's answers contain a similar claim. The plaintiffs therefore are entitled to maintain their bills for relief; but the scheme proposed by the master for regulating and apportioning the flow of the water of the stream will have to be given up, and his various findings, which are inconsistent with the conclusions above expressed, must be disregarded.

*Ordered accordingly.*