ORLANDO MASON & others *vs.* BAXTER D. WHITNEY.

Worcester.     October 1, 1906. — October 31, 1906.

Present: KNOWLTON, C. J., HAMMOND, BRALEY, & RUGG, JJ.

*Watercourse.     Mill Privileges and Water Rights.*

A custom or usage in the use of the waters of a river by the proprietor of a mill privilege and by the proprietors of other mill privileges below him on the stream, which has existed more than twenty years but never has been adverse and has created no rights by prescription, does not affect the rights of the respective proprietors to the use of the waters as against each other.

It is not unreasonable for the proprietor of a mill privilege upon a river, as against the proprietors of other mill privileges below him on the stream, to use the water of the stream in his legitimate business at night as well as by day so long as he leaves the natural flow of the stream unobstructed and undiminished during the ordinary working hours of the day.

The fact that the water of a stream comes to a riparian proprietor changed as to the hours of its accumulation and discharge in a way that would be beneficial to a riparian proprietor below him on the stream does not give such lower proprietor a right to more than the natural flow of the stream, and it is not unreasonable for the upper proprietor, even if the water above him is used only in the daytime, to use a part of it in his business in the night-time, provided he leaves as much as the regular flow of the stream to pass unaffected by his use at all times during the business hours of the day.

In determining whether the use of the waters of a stream by the proprietor of a

mill privilege is reasonable as against a proprietor below him on the stream, it is proper to consider the fact that he has a large reservoir on a tributary of the stream some miles above which he maintains and uses in connection with his mill as affecting the natural flow of the stream to the proprietor below, the part of the use of the stream and reservoir which is detrimental and that part which is beneficial to the proprietor below being taken together to show how far the upper proprietor can go in his use of the water.

BILL IN EQUITY, filed July 5, 1899, by the proprietors of mills and mill privileges on a natural watercourse called Millers River flowing through the town of Winchendon, against the proprietor of mill privileges and mills appurtenant thereto above them on the stream, to restrain the defendant from preventing the permanent flow of the water of that watercourse and the reservoirs thereof from passing to the several mill privileges or mills of the plaintiffs in the natural, ordinary and customary manner and extent during the usual working hours of the daytime of each day; to restrain the defendant from interfering with or preventing the natural, ordinary and customary flow of the waters of the watercourse during the usual working hours of the daytime of each day; to restrain the defendant from causing or permitting the waters of the watercourse to flow through the gates of the defendant's mills in the night-time, and from using the waters in the night-time in any manner that should in any wise prevent the waters from flowing in the customary, usual and natural manner and extent during the working hours of the daytime of each day; with prayers also for the assessment of damages and for further relief.

In the Superior Court *Richardson*, J. made a final decree granting an injunction and giving damages to the several plaintiffs. The defendant appealed.

*T. H. Gage, Jr.*, (*F. F. Dresser* with him,) for the defendant.

*H. Parker*, (*G. A. Gaskill* with him,) for the plaintiffs.

KNOWLTON, C. J. On Millers River in the town of Winchendon, within a distance of less than two miles, are six mill privileges, each occupied for manufacturing purposes. Altogether they have a head and fall for the use of water power on their several wheels, which amounts to ninety-eight and one half feet. The defendant owns the upper privilege, each of the parties plaintiff owns one of the others, and one is owned by persons who are not connected with this suit. The defendant's mills

are near the head of the valley. They have a fall of twenty feet, with a mill pond covering one hundred and ten acres, containing five million cubic feet of water for one foot in depth of the pond, this being something more than the entire flow of the stream for twenty-four hours. The mills have been used since 1846, in part for a machine shop, and in part as a cotton factory, and lately as a machine shop and a power house to furnish electricity to light the town of Winchendon. The mills of the several plaintiffs have been used still longer for different kinds of manufacturing. The valley is narrow, and descends rapidly from the defendant's mills to the westward. " The plaintiffs' mills have no substantial storage capacity in the respective mill ponds. It is only sufficient for from two to four hours' use when there is no inflow." The defendant maintains and uses, in connection with his mill, a large reservoir some miles up the stream on one of its branches, and the mill owner next above him maintains and uses two other reservoirs above his pond on the other branch of the stream. The master finds and the plaintiffs concede, what is clear upon the evidence, that no one of the parties has acquired any rights by prescription. The defendant's use of the water at his mills has always been such as he has found most convenient for his own purposes, and there is no foundation for a claim of use adverse to him.

For a long time previous to June, 1899, the usual hours for operating all of these establishments were from 7 A. M. to 6 P. M., with an hour's interval at noon. At an earlier period the mills ran eleven hours, and in all the years, from time to time when business was pressing, they were operated overtime during a part of the hours of the night. Since June, 1899, the defendant has used one of his two wheels ten hours per day for his machine shop, and the other, for a considerable part of each night, in producing electricity for lighting the town of Winchendon. From lack of storage capacity in their ponds, much of the water used for this latter purpose has not been utilized by the plaintiffs, and they have not been able to have the entire flow of the stream for twenty-four hours come to their wheels during the ten hours which constitute their ordinary working day. This bill is brought to recover for their loss, and to obtain an injunction against a continuance by the defendant of this use.

The plaintiffs proceed upon the theory that, because of the custom and usage of mill owners on this stream, even though no prescriptive rights have been acquired, they are legally entitled to have the water come down from the defendant's mills in such a way that, without mill ponds of their own sufficient to retain any considerable amount of water, they can use the whole flow of the stream for a day of twenty-four hours during the ten hours of the day in which they find it convenient to operate their machinery. The master has adopted this theory. The defendant made many requests for rulings in matters of law, touching this subject, which were refused or modified by the master. The defendant's requests for a ruling that the natural flow of the stream may be used " in any reasonable manner required for the operation and propulsion of works of such character and magnitude as are adapted and appropriate to the size of the stream," the master gave with the qualification that, " in the case of ancient mills, dependent on a flow which has been established by custom and use and the wants of the community, the upper proprietor must exercise his right to the use of the water with a just regard to the like reasonable use of it by the proprietors of mills immediately below, as those rights have been established by custom and usage and the wants of the community." The fifth request was that, " so long as an upper proprietor uses the water in a reasonable and lawful manner and in a way best fitted to his needs and necessities, he does not by such mere user lose any rights by prescription, and can, if a change in user becomes advantageous to him, alter and modify his user so long as he does not impair thereby the natural flow of the stream." This the master modified by inserting after the word " necessities " the words "and in the absence of any acquired right in the lower proprietors arising out of long established custom and usage and the wants of the community," and by adding, at the end, the words, " unless the flow has been established by long custom and usage." The thirteenth request was as follows: " If the plaintiffs have any rights in the defendant's user other than the rights common to all riparian proprietors they must show that such rights have been gained by prescription." To this the master added the words, " or by custom and usage extending over more than twenty years. The nature of

the custom and usage established in this case appears in the body of the report." In reference to the eighteenth request the master says, "I have based my findings on a custom and usage adopted and carried out for many years by both the plaintiffs and the defendant." In dealing with other requests, and in other parts of his report, the master refers to an established custom and usage of the plaintiffs and the defendant, in their use of this stream, which has changed the rights common to riparian proprietors upon similar streams, and limited the rights which the defendant would otherwise have to a use of the water for power. This, too, when it is found and conceded that no rights have been acquired or lost by prescription. The application of the law by the master is such that the plaintiffs are now held entitled, as against the defendant, to have his mill and pond and reservoir so managed that the entire flow of the river for the twenty-four hours shall come to their mills during the ten hours of the day when they wish to run their wheels, while if it were not for the dams and reservoirs of the defendant and another proprietor farther up the stream, the water would flow regularly night and day, so that, during the fourteen hours of each day when their mills are not running, the plaintiffs would lose much of the flow from lack of storage capacity in their ponds. The result would be that, without having acquired any prescriptive rights, the plaintiffs could compel these upper proprietors to interrupt the natural flow of the stream every day, and retain the water until the time when the plaintiffs wished to use it.

This is a mistaken view of the law. In the absence of any prescriptive rights, the plaintiffs have no greater right against the defendant, in reference to his use of the stream, than they would have if his mills and dams and reservoir and their mills and dams had been built and used but a single month. In the latter case each would have a right to a reasonable use of the water. In determining what is reasonable for each of the parties, the nature of the stream and of the several mill privileges, its adaptability to different modes of use, the wants of the community, the custom and usage of people in the neighborhood and elsewhere in regard to the management of business, the hours of labor and the use of the water of such streams, would all be proper matters for consideration as evidence. *Tourtellot*

v. *Phelps,* 4 Gray, 370. *Gould* v. *Boston Duck Co.* 13 Gray,
442, 451, 453. *Whitney* v. *Wheeler Cotton Mills,* 151 Mass. 396.
*Hazard Powder Co.* v. *Somersville Manuf. Co.* 78 Conn. 171. In
the absence of rights by prescription, the only difference in the
determination of such a question, between a case when the mills
are all new and a case when the mills have all been running
sixty years, is that, in dealing with old mills the evidence of
custom and usage as to hours of labor or the methods of doing
business, which in either case would include the practice of the
whole community in such matters, would be enlarged by taking
in, with the rest, the practice of the half dozen owners on this
stream. So far as it concerns the issue in this case, there is
nothing to indicate that, for the last fifty years, there has been
anything different in the experience of these men from that of
men and property owners generally, engaged in like pursuits.
So, upon custom and usage, the material evidence would doubt-
less be substantially the same if the mills were new as it is now.
If the plaintiffs have enjoyed gratuitously the benefit of the de-
fendant's dam and reservoir for the storage of water for their
wheels, that is not a circumstance which gives them a right to
have it in like manner in the future, or which deprives him of
the right to use the stream now as he could use it if his works
on the stream were all new. Nor does it make it less reasonable
for him to use the water now according to his interest.

So, too, the rights of these plaintiffs are not enlarged by their
suing jointly. The question as to each is whether the defend-
ant is using the water unreasonably to his detriment. If the
defendant were not using it at all — if he and one or two pro-
prietors farther up should abandon their mills and take away
their dams and open their reservoirs, so that the water would
come down to the plaintiffs' mills in its natural flow, in the
same quantity in all parts of each day of twenty-four hours —
it seems very plain that the plaintiffs would have no legal
ground of complaint, although they would be able to use on
their wheels, during each working day of ten hours, very much
less water than they use now.

The question of chief difficulty in the case is: How far is it
reasonable for a mill owner on such a stream to use the water in
the night-time, for a legitimate business which calls for power

during that part of the day, although in most kinds of business power is used not more than ten hours in a day? It is a familiar fact that certain industries cannot be conducted profitably without a use of power in the night-time. This is true of paper manufacturing, which is an important industry in Massachusetts, of producing electricity for lighting and for the use of street railways, of powder manufacturing and of some other kinds of business. All kinds of legitimate business are alike entitled to the protection of the law. This is recognized in the cases which show a use of water power in the night-time, to the detriment of proprietors who wish to use it only in the daytime. *Barrett* v. *Parsons*, 10 Cush. 367. *Bullard* v. *Saratoga Victory Manuf. Co.* 77 N. Y. 525. *Keeney & Wood Manuf. Co.* v. *Union Manuf. Co.* 39 Conn. 576. *Hazard Powder Co.* v. *Somersville Manuf. Co.* 78 Conn. 171.

The primary right of every riparian proprietor is to have the natural and customary flow of the stream, without obstruction or change. This primary right is modified by the right of every proprietor to make a reasonable use of the water, which leaves the lower proprietor the natural flow, changed, so far as it may be, by such previous use on the stream above. If such use makes the flow more advantageous for the lower proprietor than the flow in its strictly natural state, he gets the benefit of it, as an incident of his ownership, which he may enjoy while it lasts, but not as permanent property that he can control for the future. The fact that a reasonable use by an upper proprietor leaves the flow more beneficial than the strictly natural flow to those on the stream below, may well be considered as a circumstance, so long as the condition remains, in determining what is a reasonable use for an intermediate proprietor, in reference to those farther down. In this way a reservoir, reasonably constructed and used in connection with a stream, may so far affect the stream below as properly to be taken into account in passing upon the conduct of lower riparian proprietors.

We have been referred to no adjudication, and after searching we have found none, that determines how far a proprietor, under a claim of a reasonable use, may change the natural flow of a stream by appropriating its waters in the night-time and holding them back in the daytime. In *Barrett* v. *Parsons*, 10 Cush.

367, 372, the judge left to the jury the question, whether the defendant had " used the water in a reasonable and proper manner, for the regular prosecution of his business," or " had used it unreasonably, wantonly, and unnecessarily, by running his mill at unusual and unreasonable hours, and holding back the water, and letting it down to the plaintiffs' works at improper times of the day and night, so that the plaintiffs were thereby deprived of the reasonable, ordinary, and proper use of their mills." The defendant had used his grist mill a great deal in the night-time, and had let down to the plaintiffs but little water in the daytime. A detention of water in the night-time and an increased use of it in the daytime have often been held to be reasonable, even when they affected unfavorably a particular proprietor below. This is because such use is in accordance with the usual and convenient method of transacting most kinds of manufacturing business. But reversing the method would be detrimental to the interests of most lower riparian proprietors. In all the five cases last above cited, the decision was adverse to the contention of mill owners that they could lawfully change the natural flow of a stream by using the water at night and holding it back in the daytime, to the damage of owners below. But we are of opinion that it is not unreasonable for a mill owner, if his interest requires it, to use the water of his stream in his business at night as well as by day, so long as he leaves the natural flow of the stream unobstructed and undiminished during the ordinary working hours of the day. If an upper proprietor maintains, for his own purposes, a reservoir for the storage of water that falls in the wet season, to be let down into the stream in times of low water, and in such times increases the flow by letting down water, the additional quantity that so comes each day may be treated as a part of the natural flow for the twenty-four hours, in determining the rights of a lower mill owner in reference to the use of other mill owners farther down the stream. But the mill owner ought not to be under an obligation, against his own interest, to hold back water in the night-time in order to enable his neighbor below to use it more profitably the next day. The lower proprietor is " entitled only to the natural flow, not to an intermittent flow." *Weare* v. *Chase*, 93 Maine, 264, 269. We think this too plain for doubt where the stream comes

to the upper proprietor with its strictly natural flow unchanged by any use above. If there is a use above which usually sends down to him most of the water in the daytime, the subject takes on difficulties. Does reasonable conduct require him to forego his own interest, in order to give the proprietor below something better than the natural flow of the stream, because it comes to him changed, in a way that would be beneficial to the lower proprietor? The general statement of the law in the decisions indicates that, in the absence of special rights acquired by grant or prescription, a riparian proprietor is entitled to nothing more or better than the natural flow of the stream. If he wishes to use all the water during a part of the day, he may provide for himself storage, or otherwise adapt his works to the conditions. We are of opinion that it is not unreasonable for a mill owner, even if the water above him is all used in the daytime, to use a part of it in his business in the night-time, provided he leaves as much as the regular, natural flow of the stream, unaffected by use, to pass by at all times during the ordinary business hours of the day. We do not say, as a matter of law, that there may not be conditions which would make it reasonable to increase or diminish such a use in the night-time. But under the conditions that appear in this case, we think this a correct statement of what is reasonable between the parties.

Inasmuch as the use of the defendant's reservoir on the stream above is a part of his use of the stream at his mills for his own convenience, we think his entire use at the mills and at the reservoir should be considered together, in its effect upon the natural flow to the plaintiffs below, in determining the limits of the defendant's rights. That part of his use which is detrimental and that part which is beneficial to the plaintiffs, when taken together, will show how far he can go in the use of the water without invading their rights. *Elliot* v. *Fitchburg Railroad*, 10 Cush. 191, 197.

It is unnecessary to consider in detail the numerous exceptions that were taken. The principles above stated will enable the parties to determinate their rights.

              *Decree reversed ; case to stand for further hearing.*