# Richmond

## DAVIS v. TOWN OF HARRISONBURG.

### November 12, 1914.

1. APPEAL AND ERROR—*Two Trials Below.*—Upon a writ of error to a judgment in an action wherein there were two trials in the court below, this court is required by section 3484 of the Code to look first to the evidence and proceedings on the first trial.

2. EVIDENCE—*Unreasonable Use of Water—Detention—Flat Rate for Electricity as Increasing Use of Water.*—Where the hydro-electric plant of a municipal corporation was adapted to the ordinary capacity of the stream, and its detention of the water of the stream was reasonable, even under a flat rate system of charges for the electric current, evidence of extravagant consumption of electricity by the patrons of the municipality under the flat rate system, is inadmissible in an action by a lower riparian owner against the municipality to recover damages for the unreasonable detention of the water of the stream.

3. RIPARIAN OWNERS—*Reasonable Use of Flowing Stream.*—The reasonableness of the use of a stream depends upon the nature and size of the stream, the business or purposes to which it is made subservient, and on the ever varying circumstances of each particular case. Each case must, therefore, stand upon its own facts, and can be a guide in other cases only as it illustrates the application of general principles.

4. RIPARIAN OWNERS—*Use of Stream for Machinery—Normal Condition .of Stream—Drouth—Detention of Water.*—The normal, not the abnormal, condition of a stream must control, in the matter of installing suitable machinery, and likewise in determining the reasonableness of the use of flowing water. To apply general principles indiscriminately and inflexibly to seasons of extreme drought would result in disastrous consequences and practically destroy the beneficial use of a stream for mechanical purposes. Hence the prevailing doctrine is that in times of unusual drought it is not an unreasonable use of a stream for the owner of machinery, which the power of the stream in its ordinary stages is adequate to propel, to detain

. so much of the water and for such reasonable time as may be necessary to enable him to use such machinery advantageously. The adoption of a different rule would paralyze industries along the entire stream from its source to its mouth.

Error to a judgment of the Circuit Court of Rockingham county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Sipe & Harris,* for the plaintiff in error.

*D. O. Dechert* and *H. W. Bertram,* for the defendant in error.

Whittle, J., delivered the opinion of the court.

The *gravamen* of this action is the alleged wrongful and unlawful obstruction of the natural flow of the Shenandoah river by the defendant in error, the upper riparian owner of a hydro-electric plant, to the damage of the plaintiff in error, the occupant of two down-stream merchant flouring mills.

There were two trials of the case. At the first trial (the record of which was preserved) the jury returned a verdict for the plaintiff and assessed his damages at $1,300, which verdict the court set aside on the ground that it was contrary to the law and the evidence. At the second trial, upon substantially the same evidence, there was a demurrer to the evidence which the court sustained, and entered judgment for the defendant. Therefore, in pursuance of section 3484 of the Code, we must primarily consider the correctness of the court's ruling in setting aside the first verdict.

At that trial the court, over the objection of the defendant, admitted certain evidence showing the adoption by the defendant of a flat rate system of charge for electric light in the town of Harrisonburg, the tendency of which, it was contended, led to extravagance and waste in the use of current, and incidentally caused an unreasonable detention of water to generate unnecessary power.

It appears from the undisputed facts that the defendant's plant was adapted to the ordinary capacity of the stream, and that its detention of the water was reasonable, even under the flat rate system. For that reason the court correctly held that the defendant owed the plaintiff no duty in respect to the manner in which it chose to dispose of its product. The court in its opinion says: "This (the adoption of the flat rate) is the ground which was stressed and mainly relied on in the argument to the jury to sustain the plaintiff's right to damages, and it must have been the ground on which the jury based its verdict." Upon the facts proved, evidence of extravagant consumption of electricity by the defendant's patrons under the flat rate system was plainly inadmissible, and since it was not possible for the court to determine to what extent this inadmissible evidence may have influenced the finding of the jury, there was no escape from setting aside the verdict.

This brings us to the consideration of the remaining question in the case—namely, the action of the court in sustaining the defendant's demurrer to the evidence.

It would be unprofitable to attempt to rehearse the voluminous evidence found in this record. The essential facts from the standpoint of the demurrer to the evidence are these: The defendant, in the year 1904, purchased the old Shaver mill site on the Shenandoah river with the view of supplying the town of Harrisonburg with electric light and power.

During the months of the years 1909, 1910 and 1911 covering the period of this controversy, the plaintiff was the lessee of the "River Bank Mill" on the Shenandoah river, two miles below the defendant's works, and also the owner of the "Waterloo Mill," one and a half miles still further down-stream. In the year 1905 the defendant, by leave of court in a proceeding under chapter 61 of the Code, raised the height of its dam from five feet to fifteen feet, and proceeded to install its machinery, which, as remarked, was adapted to the ordinary flow of the stream (without the need of deepening the tail-race two feet as contemplated by the original plan). The accuracy of the testimony of expert witnesses on that subject was fully vindicated by actual experience. The plant included three dynamos, each to be operated by a separate turbine wheel, and capable of independent action. The total capacity of the plant was approximately 1150-horse power, about 750 of which was deliverable in the town of Harrisonburg, The three units were of equal capacity, of about 385-horse power each at the plant and 270-horse power at the point of delivery.

The specific ground of complaint is that the defendant by shutting its gates partially obstructed the flow of the stream in the day time, and impounded the water for the operation of its machinery in the night time, thus, as alleged, injuriously affecting the plaintiff's business during the continuance of the obstruction.

The dates of the detention of the water set out in the declaration were shown to have been seasons of extraordinary drought, and even then the gates were only closed when the head of water had fallen so low as to render it otherwise impracticable to operate the defendant's plant in the night time. Moreover, it appeared that one of the turbines had never been installed, and of the two that had been set up only one was employed, and the

current delivered in the town from that source at no time exceeded 200-horse power.

The foregoing summary of the facts proved sustains the defendant's contentions: 1. That its machinery was reasonably adapted to the ordinary flow and capacity of the Shenandoah river; 2. That its rights as a riparian proprietor were equal to those of the plaintiff; 3. That it had the right to reasonably detain the water, and at no time exceeded that right; and, consequently, that any loss or inconvenience that the plaintiff may have suffered from such reasonable use of the stream by the defendant was *damnum absque injuria.*

We have found the governing principle in this class of cases nowhere more clearly stated than in 2 Cooley on Torts, p. 1209, where the distinguished author in discussing the subject of the detention of the water of a stream says: "The general rule is that each riparian proprietor is entitled to the steady flow of the stream according to its natural course. But to apply this rule strictly would be to preclude the best use of flowing waters in most cases; and where power is desired, the rule must yield to the necessity of gathering the water into reservoirs. It is lawful to do this when it is done in good faith, for a useful purpose, and with as little interference with the rights of other proprietors as is reasonably practicable under the circumstances."

This statement of the law is well sustained by the authorities cited in the notes. See also *Mumpower* v. *City of Bristol,* 90 Va. 151, 17 S. E. 853, 44 Am. St. Rep. 902.

Judge Cooley adds: "It is an unreasonable detention of the water to gather it into reservoirs for future use in a dry season, or for the purpose of obtaining a greater supply than the stream affords by its natural flow in ordinary stages."

Again, at p. 1207, he says: ''The reasonableness of the use depends upon the nature and size of the stream, the business or purposes to which it is made subservient, and on the ever-varying circumstances of each particular case. Each case must, therefore, stand upon its own facts, and can be a guide in other cases only as it may illustrate the application of general principles.''

The case of *Gould* v. *Boston Duck Co.,* 13 Gray (Mass.) 443, is strikingly analogous in its material facts to the case in judgment. There the works of the defendant, the upper proprietor, were adapted and appropriate to the size and capacity of the *ordinary* volume and flow of the water, but without reference to the necessities or demand for water of the plaintiff in seasons of *extraordinary* and *extreme drought.* During each of the dry seasons in four successive years, the defendants were unable to operate their factory throughout the usual working hours of each working day, but in order to create the requisite head and to supply the water for their own works, it was necessary to shut their gates earlier than usual on some days, and sometimes for a whole day at once. This, however, was not done wantonly, but with reasonable regard to the interests of the defendants. The plaintiff's mills required less than half the supply of water necessary for operating the defendant's factory, and during the dry seasons mentioned the plaintiff might have run his mills, or one of them, during working hours had not the defendants by shutting their gates stopped the supply of water during a portion of the usual working hours; that in each dry season, as well as at other times, the defendants would discharge through their wheels at least double the quantity of water necessary for operating the plaintiff's mills, and that the surplus so discharged flowed over the plaintiff's dam and was of no use or benefit to the plaintiff. Upon

these facts, the Supreme Judicial Court of Massachusetts, speaking through Shaw, C. J., held, that the defendants made no other than a reasonable use of the water, and that the consequent inconvenience to the plaintiff was, under the circumstances, *damnum absque injuria.* To the same effect are Gould on Waters, sec. 218, p. 428; Farnham on Waters, sec. 476, p. 1613.

Careful consideration of the case of *Mason* v. *Whitney,* 193 Mass. 152, 78 N. E. 881, 7 L. R. A. (N. S.) 289, 118 Am. St. Rep. 488, so much relied on by counsel for the plaintiff, will show that it is not at all in conflict with the earlier case of *Gould* v. *Boston Duck Co., supra.* The facts in the two cases are different, and it is apparent that the court in the later case was dealing with a situation involving the habitual withholding by the upper proprietor of the *ordinary* flow of the stream.

It is not practicable to review the numerous cases to which our attention has been drawn. Those that have been referred to sufficiently illustrate the controlling principles applicable to the facts in the instant case, and sustain the judgment under review. Necessarily courts must deal with these questions in which not alone the immediate parties but, in most instances, the public as well are vitally interested, in a reasonable and practical way. The normal, not the abnormal, condition of a stream must control in the matter of installing suitable machinery, and likewise in determining the reasonableness of the use of flowing water. To apply general rules indiscriminately and inflexibly to seasons of extreme drought would result in disastrous consequences, and practically destroy the beneficial use of a stream for mechanical purposes. Hence the prevailing doctrine is that in times of unusual drought it is not an unreasonable use of a stream for the owner of machinery, which the power of the stream in its ordinary stages is ade-

quate to propel, to detain so much of the water and for such reasonable time as may be necessary to enable him to use such machinery advantageously. The adoption of a different rule would paralyze industries along the entire stream from its source to its mouth—indeed, the person only whose property is situated at the mouth of the stream could avail of its benefits for the operation of machinery. The courts should be slow to lay down principles that would lead to any such consequences.

We do not consider that the present case is affected by the statutes in relation to the obstruction of navigation or the passage of fish; nor that the rights of the plaintiff, under section 1355 of the Code, have been infringed by the defendant in raising the height of its dam.

Upon the whole case, we find no reversible error in the judgment of the circuit court and it must be affirmed.

*Affirmed.*